# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

UNITED STATES OF AMERICA,

    **Plaintiff,**

**v.**                                              No. 25-20287-SHL

MALIK WILLIAMS,

    **Defendant.**

---

### MOTION TO DISMISS INDICTMENT

---

Defendant, Malik Williams, moves the Court to dismiss the indictment returned by the Grand Jury on November 6, 2025. (R. 6). Williams brings this motion on the following grounds:

The indictment's exclusive claim is that on October 5, 2025, Malik Williams, knowing that he was an unlawful user of a controlled substance as defined in Title 21, United States Code, Section 802, knowingly possessed a firearm, that is, a Glock Model 27, .40 caliber pistol, and the firearm had been transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g)(3). The indictment should be dismissed because §922(g)(3) is unconstitutional as applied to Mr. Williams. The Second Amendment, <u>New York State Rifle & Pistol Association, Inc., et. al. v. Bruen, Superintendent of New York State Police, et. al.</u>, 597 U.S. 1 (2022) and its progeny, and <u>United States v. Daniels</u>, 124 F.4th 967 (5th Cir. 2025) supply the authority.

1

FACTS

On October 5, 2025, at 8:00 pm, Tennessee Highway Patrol Trooper, Martin Penny, was traveling on Clarke Road when the driver of a 2005 silver Toyota Camry turned in front of his marked vehicle. Penny observed a broken taillight on the Camry and trailed it. Penny estimated the Camry was going 55 mph in a 35 mph zone.

Penny conducted a traffic stop on the Camry. The stated probable cause was speeding and an inoperable taillight. Penny approached the driver side of the vehicle. The driver was not buckled up. Penny requested the driver's license and vehicle registration. The driver could not provide a driver's license. While questioning the driver, Penny noticed the odor of raw marijuana.

Penny asked the driver to get out of the car so he could conduct a search of the car. Penny requested the assistance of Federal Bureau of Investigation Special Agent, Andrew Bland, in securing the passenger, Defendant, Malik Williams. As Bland escorted Williams away from the car, Williams ran for about 20 yards. Bland and two other officers brought Mr. Williams to the ground and applied handcuffs.

During the search, two clear plastic bags containing marijuana were discovered in Williams's possession containing a total of 16.2 grams of marijuana. Williams informed officers that he had a firearm strapped to his right ankle. Officer retrieved a Glock 27 .40 caliber pistol with a loaded magazine. Nine rounds of ammunition were recovered from the firearm.

On the date of his arrest, Williams had no criminal convictions on his record. There were several pending charges against Williams including Violation of Financial Law and Vehicle Registration, Improper Display of Registration, no Driver's license, Theft of Property,

2

Misdemeanor Possession of Marijuana, Unlawful Possession of Weapon, and resisting Official Detention. These unrelated offenses were alleged to have occurred between August and December, 2025.

LAW AND ARGUMENT

Title 18, United States Code, Section 922(g) makes it unlawful for certain classes of individuals to possess any firearm or ammunition that had moved in interstate commerce. Those prohibited classes are: convicted felons (§ 922(g)(1)); fugitives from justice (§ 922(g)(2)); unlawful users or addicts of controlled substances (§ 922(g)(3)); mental defectives (§ 922(g)(4)); illegal aliens (§ 922(g)(5)); dishonorably discharged servicemen (§ 922(g)(6)); persons who have renounced their U.S. citizenship (§ 922(g)(7)); persons who are subject to domestic violence protection orders (§ 922(g)(8); and persons who have been convicted of a misdemeanor crime of domestic violence (§ 922(g)(9)).

The Second Amendment to the United States Constitution states: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Since 2008, Second Amendment jurisprudence has been shaped by three major cases. First, in District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment codified a pre-existing individual right to "possess and carry weapons in case of confrontation." Heller, 554 U.S. at 599-600. Heller further provided that the right to possess and carry weapons was "not limited to the carrying of arms in a militia." 554 U.S. at 599.

Heller struck down two District of Columbia statutes. One banned possession of handguns in the home, and the other required all other guns in the home to be rendered

3

inoperable. In finding those laws unconstitutional, the Court found the Second Amendment right for a law-abiding citizen to possess arms for self-protection to be so fundamental that no competing factors need to be weighed as in other cases. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family would fail constitutional muster." Heller, 554 U.S. at 628-629.

The Supreme Court adopted a historical view of the Second Amendment. Interpretation of the Amendment must include consideration of how the Amendment was perceived  by courts and legislatures closer in time to its enactment. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." That involved surveying 18th-century (ratification of the Constitution) and 19th-century (passage of the 14th Amendment) written sources. The "arms" protected by Heller were the sorts of weapons "in common use at the time." What Heller didn't protect was the sort of weapon that was commonly believed to be dangerous or unusual.

"Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 627-628.

Nevertheless, the Court left for another day an analysis of the full scope of the Second Amendment. Heller, 554 U.S. at 626. Does the Second Amendment apply outside the home? What weapons are protected by the Second Amendment? Who can be prohibited from possessing firearms?

Second, the Court in McDonald v. City of Chicago,  561 U.S. 742 (2010) held that the Second Amendment applies to the states. After Heller, Federal circuit courts adopted a two-step

4

Second Amendment analysis: First, does a law burden or regulate conduct that comes within the scope of the Second Amendment? Second, if so, apply strict scrutiny if the law implicates Heller's "core" right, "the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." Otherwise, intermediate scrutiny would apply. Bauer v. Becerra, 858 F.3d 1216, 1221 (9th Cir. 2017); United States v. Jimenez, 895 F.3d 228, 234 (2d Cir. 2018).

Finally, with New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111 (2022), the era of different levels of scrutiny came to an end. In fact, Justice Thomas started his opinion thus:

"Since Heller and McDonald, the Courts of Appeals have developed a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. The Court rejects that two-part approach as having one step too many. Step one is broadly consistent with Heller, which demands a test rooted in the Second Amendment's text, as informed by history. But Heller and McDonald do not support a second step that applies means-end scrutiny in the Second Amendment context. Heller's methodology centered on constitutional text and history. It did not invoke any means-end test such as strict or intermediate scrutiny, and it expressly rejected any interest-balancing inquiry akin to intermediate scrutiny." Bruen, 142 S.Ct. at 2117-2118.

The facts in Bruen focus on New York's "good cause" requirement for issuing concealed-carry licenses. New York was one of seven states that required an applicant for a concealed-carry license to show, in addition to the standard questions posed on the application, "good-cause" for the issuance of a license. To New York, "good cause" required an individualized need for self-defense distinguishable from that of the general community.

The Supreme Court applied a test consistent with Heller while eliminating the balancing test that seeped into Second Amendment jurisprudence in the years following Heller. To determine whether a firearm regulation is consistent with the Second Amendment, the Court begins with the plain language of the Second Amendment. Malik Williams is an ordinary, law-abiding, adult citizen and is part of "the people" whom the Second Amendment protects. His

5

Glock 27 .40 caliber pistol is "in common use" today for self-defense. The plain text of the Second Amendment protects Williams's proposed course of conduct, carrying a handgun publicly for self-defense. The plain language of the Second Amendment makes no provision for whether Williams was an unlawful user of a controlled substance. Bruen, 142 S.Ct. at 2119.

The burden then falls on the government to show that § 922(g)(3) is consistent with the nation's historical tradition of firearm regulation. But when it comes to interpreting the Constitution, not all history is created equal. Historical sources from the 1200s or from the 20th century will not necessarily reflect the intent of the drafters of the Bill of Rights or the gun regulations of Reconstruction. *Id.*

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." Heller, 554 U. S., at 634-635. The Second Amendment was adopted in 1791; the Fourteenth Amendment in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right.

The inquiry involves two relevant metrics: first, whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether that regulatory burden is comparably justified. Because "individual self-defense is 'the central component' of the Second Amendment right," these two metrics are "'central'" considerations. Bruen, 142 S.Ct. 2118; McDonald, 561 U. S., at 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (quoting Heller, 554 U. S., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637).

Bruen instituted a burden shifting component. Once the gun regulation in question violates the text of the Second Amendment, the burden shifts to the proponent of the constitutionality of the regulation to present analogous historical documentation that the infringement has a longstanding historical basis. That is, if the Court believes that the restriction

imposed by § 922(g)(3) on a user of marijuana exceeds the plain language of the Second Amendment, the burden shifts to the government to show that the nation has a history of analogous gun regulations going back to the time of the ratification of the Constitution and the passage of the 14th Amendment.

So how is the historical record to be used? When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical gun regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through means having nothing to do with gun regulation, that also could be evidence that a modern regulation is unconstitutional. If some jurisdictions attempted to enact analogous regulations during this timeframe, but those proposals were rejected by legislatures or on constitutional grounds, that rejection would provide some probative evidence of unconstitutionality. Bruen, 142 S. Ct. at 2131.

The specific provision of federal law under consideration in this motion is 18 U.S.C. §922(g)(3). That section prohibits unlawful users or addicts of controlled substances from possessing firearms. It has been held unconstitutional by the Fifth Circuit in United States v. Daniels, 77 F.4th 337, 2023 U.S. App. LEXIS 20870 (5th Cir. Miss., Aug. 9, 2023). On July 2, 2024, the United States Supreme Court granted the petition for writ of certiorari, vacated the judgment, and remanded the case to the Fifth Circuit for further consideration in light of United States v. Rahimi, 602 U. S. 680, 2024 U.S. LEXIS 2714 (2024).
United States v. Daniels, 2024 U.S. LEXIS 2910 *, 144 S. Ct. 2707, 219 L. Ed. 2d 1313, 92 U.S.L.W. 3346, 2024 WL 3259662.

After Rahimi, the Fifth Circuit heard a similar challenge to a prosecution brought under § 922(g)(3). In that case, United States v. Connelly, 2024 U.S. Dist. LEXIS 63518, 2024 WL 1460762, the Fifth Circuit held that the government could not constitutionally apply § 922(g)(3) to a defendant based solely on her "habitual or occasional drug use." 117 F.4th 269, 282 (5th Cir. 2024). The Fifth Circuit held that Connelly controlled Daniels. Because the jury did not necessarily find that Daniels was presently or even recently engaged in unlawful drug use, the Fifth Circuit again reversed Daniels' conviction and remanded to the Supreme Court.

In addition to the Daniels case, on October 20, 2025, the Supreme Court granted a petition for writ of certiorari in United States v. Hemani, another Fifth Circuit case, which directly challenges § 922(g)(3) for marijuana users, signaling a potential definitive ruling on its constitutionality. In essence, the debate centers on whether being a user of unlawful substances, especially benign ones like marijuana, makes someone inherently "dangerous" enough to forfeit their Second Amendment rights under historical standards.

The facts in Daniels were that Patrick Daniels was arrested after police found loaded firearms and marijuana cigarette butts in his vehicle. Daniels admitted to regularly using marijuana, approximately 14 days per month. Daniels was convicted by a jury of violating §922(g)(3) for being an "unlawful user" of marijuana while possessing firearms. But the jury did not necessarily find that Daniels was intoxicated at the time of his arrest, nor did it identify the last time Daniels used an unlawful substance. The jury instructions allowed conviction if Daniels used marijuana recently enough to be considered "actively engaged" in unlawful use, without specifying a precise timeframe.

The Daniels Court explained that throughout American history, laws have regulated the combination of guns and intoxicating substances. But at no point in the 18th or 19th century did

8

the government disarm individuals who used drugs or alcohol at one time from possessing guns at another. A few states banned carrying a weapon while actively under the influence, but those statutes did not emerge until well after the Civil War. Section 922(g)(3) was not enacted until 1968, nearly two centuries after the Second Amendment was adopted.

The Court held that though the history and tradition may support some limits on an intoxicated person's right to carry a weapon, it does not justify disarming a sober citizen based exclusively on his past drug usage. They concluded that, as applied to Daniels, § 922(g)(3) violates the Second Amendment. 77 F.4th 337, 339.

The Sixth Circuit has had limited input into the constitutionality of 922(g)(3). In United States v. Vanochten, 150 F.4th 552, 553, 2025 U.S. App. LEXIS 20103, *1, 2025 FED App. 0215P (6th Cir.), 1, 2025 LX 329062, __ F.4th __, 2025 WL 2268042, the Sixth Circuit denied an as applied challenge to constitutionality, but on a wildly different set of facts. Sheriff's deputies found VanOchten holding a Glock pistol in his garage after receiving reports of someone shooting a rifle in a backyard. VanOchten admitted to firing an Armalite rifle at birds in his backyard in the direction of a propane tank. At the time, VanOchten was drunk (blood alcohol level of.157) and high on marijuana. Deputies found a warm marijuana pipe on his workbench, and VanOchten admitted to regularly using marijuana. During searches of VanOchten's home, deputies found several semiautomatic firearms, three pistols, three pipe bombs, and a large cache of ammunition.

The Sixth Circuit held that18 U.S.C.S. § 922(g)(3), which prohibits unlawful drug users from possessing firearms, is constitutional as applied to dangerous individuals like VanOchten. VanOchten demonstrated that he posed a clear risk of future harm to others if armed by firing a

9

rifle in a residential neighborhood in the direction of a propane tank while drunk and high. Very different from the fact scenario in this case.

Another Sixth Circuit case, United States v. Goins, 118 F.4th 794 (6th Cir. 2024), dealt primarily with a challenge to 18 U.S.C. § 922(g)(1). But in a concurrence by Judge Bush, he warned the majority of outer boundaries of the forfeiture of Second Amendment rights. He points out that one of those is the issue in front of this court:

"I am less confident, however, in the majority's reliance on Goins's prior DUI and drug offenses as additional reasons for upholding his firearm-possession conviction. In fact, the evidence suggests our nation's history and tradition do not support permanent disarmament because of prior convictions related to drunkenness or the misuse of drugs when, as here, the earlier illegal conduct did not involve a firearm.

Historical precedent recently surveyed by the Fifth Circuit is instructive. In United States v. Connelly, ___ F.4th ___ , No. 23-50312, 117 F.4th 269, 2024 U.S. App. LEXIS 21866, 2024 WL 3963874 (5th Cir. Aug 28, 2024), the court held that the Second Amendment barred prosecution of a marijuana user, with no history of violent firearm use, for possessing a firearm under 18 U.S.C. § 922(g)(3). The court found that "our history and tradition may support some limits on a presently intoxicated person's right to carry a weapon . . ., but they do not support disarming a sober person based solely on past substance usage." 2024 U.S. App. LEXIS 21866, [WL] at *1.

Here, the majority does not address history and tradition related to firearm prohibitions as applied to alcohol or drug users. Instead, it relies on historical evidence demonstrating that governing officials categorically disarmed groups of people who were dangerous to the public safety, such as disaffected persons and those who participated in insurrections like Shays's Rebellion. Majority Op. at 5-10. Those groups, of course, were deemed dangerous not because of any misuse of intoxicants. Rather, disarmament occurred because the government considered them likely to take up arms against the state. See Connelly, 2024 U.S. App. LEXIS 21866, 2024 WL 3963874, at *5 (describing historical examples of "laws barring political dissidents from owning guns in periods of conflict" and "laws that disarmed religious minorities—especially Catholics"). This history and tradition of disarming "dangerous" political groups and religious minorities seems too far afield to provide supporting precedent for disarmament based on substance abuse, at least when, as here, the defendant has no history of violence through firearm misuse. See id. ("[O]ur history and tradition of disarming 'dangerous' persons does not include non-violent marijuana users like [the defendant].").

The only precedent from the Founding era cited by the government in support of disarmament related to alcohol or drug misuse were laws that temporarily prohibited gun possession by persons who were presently intoxicated. See Appellee's Br. at 36 & n.20 (discussing State v. Shelby, 90 Mo. 302, 2 S.W. 468 (Mo. 1886), which upheld a ban on intoxicated persons possessing firearms). There is no suggestion from the relevant historical record that a person was ever permanently disarmed for criminal offenses related to intoxicant misuse. So even if the historical examples cited by the government explain why individuals like

10

Goins can be disarmed while in a state of intoxication, they are not relevantly similar with respect to permanent disarmament based on past alcohol-or drug-related convictions, particularly if those prior convictions did not involve firearm misuse. See, <u>N.Y. St. Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 597 U.S. 1, 29, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022) (explaining that a historical analogue should explain "how and why the regulations burden a law-biding citizen's right to armed self-defense").

History and tradition speak loudly here because the societal problem at issue—alcohol and drug abuse—is nothing new. Misbehavior from intoxicants seems to have been as prevalent at the Founding as it is now. See, e.g., <u>United States v. Rahimi</u>, 602 U.S. 680, 144 S. Ct. 1889, 1897, 219 L. Ed. 2d 351 (2024) ("At the founding, the bearing of arms was subject to regulations . . . on gun use by drunken New Year's Eve revelers."); <u>Connelly</u>, 2024 U.S. App. LEXIS 21866, 2024 WL 3963874, at *7 ("[E]arly Americans, including the Founders, consumed copious amounts of alcohol."); 2024 U.S. App. LEXIS 21866, [WL] at *7 n.4 (citing examples of the Founders' alcohol use and citing one historian who noted that "'[i]n the early Republic,' there was 'an extremely high level of alcohol consumption (chiefly, distilled spirits)'"). Also, drugs were abused then like they are now. See, e.g., Letter from John Marshall to Henry Lee, July 18, 1796, in 3 Papers of John Marshall (C. Cullen ed. 1979), 35 (Marshall informing Lee that Alexander Campbell, a fellow member of the U.S. Supreme Court bar, died from an overdose of the tincture of opium known as laudanum).

Nonetheless, the Founding generation apparently did not consider a person's history of alcohol or drug misuse to be a good enough reason to permanently deprive that person of his right to possess and use a firearm. See Connelly, 2024 U.S. App. LEXIS 21866, 2024 WL 3963874, at *7 ("[N]either Congress nor the states disarmed alcoholics[.]"); 2024 U.S. App. LEXIS 21866, [WL] at *6 ("The government identifies no class of persons at the Founding who were 'dangerous' for reasons comparable to marijuana users."). To the contrary, it seems the Founding generation considered the right to bear arms as too important a right to be limited based simply on a person's prior substance abuse. Guns were needed for self-defense, the provision of food, and the protection of one's community. See <u>District of Columbia v. Heller</u>, 554 U.S. 570, 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). Those needs apparently outweighed any justification to permanently disarm based upon a person's past misuse of intoxicants. Indeed, the right to bear arms was fundamentally important for human freedom. See <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 778, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) ("[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."). This historical understanding seems at odds with the majority's reliance on Goins's DUI and drug convictions as relevant factors to justify his disarmament. Through its emphasis on those convictions, the majority risks engaging in the type of "legislative interest balancing" Bruen rejected. See 597 U.S. at 26.

But we need not decide what relevance, if any, that Goins's convictions related to alcohol or drugs have on the constitutionality of § 922(g)(1) as applied to him. Instead, his conviction for illegal possession of a firearm may be upheld simply because Goins was on probation at the time of his offense."

<u>United States v. Goins</u>, 118 F.4th 794, 805-807, 2024 U.S. App. LEXIS 25355, *24-29, 2024 FED App. 0228P (6th Cir.), 15-17, 2024 WL 4441462

The government has the burden to find and explicate the historical sources that support the constitutionality of § 922(g)(3). <u>Rahimi</u>, 61 F.4th at 455 (citing <u>Bruen</u>, 142 S. Ct. at 2132-33). To do so, the government will have to overcome factual arguments in its way on the Daniels/Hemani path to as applied constitutionality.

At the time of his arrest, Williams had no criminal history. There is no evidence that he was under the influence of any controlled substance at the time of his arrest. Even if he had been, as a passenger in the Camry, he posed no threat to public safety because he was not operating a motor vehicle. He was occupying a vehicle driven by another person.

Williams is only 19 years-old so he does not have an extensive employment history. But he has managed to remain regularly and gainfully employed since the age of 16. That is not something many addicted to illegal drugs could say.

WHEREFORE, Defendant requests that the Court hold that Title 18, United States Code, Section 922(g)(3) is unconstitutional as applied to Malik Williams and dismiss the indictment on that ground. Alternatively, Mr. Williams requests that this case be held in abeyance until the United States Supreme Court rules on the constitutionality of the statute.

Respectfully submitted,
LAW OFFICE OF
STEPHEN R. LEFFLER, P.C.

s/Stephen R. Leffler (11038)
Attorney for Defendant
1519 Union Ave., Box 212
Memphis, Tennessee 38104
(901) 527-8830
Stephen@Lefflerlaw.com

12